UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| TYREE DAVIS, **Plaintiff,** v. COMMISSIONER OF SOCIAL SECURITY, **Defendant.** | Civ. No. 18-17126 (KM) OPINION |

### KEVIN MCNULTY, U.S.D.J.:

The plaintiff, Tyree Davis, brings this action pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3) to review a final decision of the Commissioner of Social Security ("Commissioner") denying his claims to Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act.

The decision appealed from was largely favorable to Davis. The Administrative Law Judge ("ALJ") found that Davis was disabled and awarded benefits starting from a disability onset date of February 24, 2015. The ALJ found that Davis was not disabled, however, prior to that date. It is from that latter determination that Davis appeals.

For the reasons stated below, the decision of the Commissioner is affirmed.

1

## I. Background[1]

On July 15, 2014, Mr. Davis applied for DIB and SSI, alleging a variety of conditions, including post-traumatic stress disorder (PTSD) resulting from his military service in Iraq. He claimed an onset date of September 22, 2008. The claims were denied initially and on rehearing. On June 29, 2017, the ALJ held a video hearing, and heard testimony from the claimant and from a vocational expert (VE). Davis was represented by counsel at the hearing. (R. 13).

On August 8, 2017, the ALJ issued a decision (R. 9–30), finding that Davis was not under a disability prior to February 24, 2015, but became disabled on that date and has continued to be disabled. The Appeals Council, which accepted additional evidence, affirmed the decision of the ALJ, rendering it the final decision of the Commissioner. (R. 1–8)

On December 12, 2018, Mr. Davis filed this action, seeking to overturn the unfavorable portion of the ALJ's decision. Initially assigned to Chief Judge Linares, it was reassigned to me upon Judge Linares's retirement. (DE 11)

## II. Standard

To qualify for DIB or SSI, a claimant must demonstrate that there is some "medically determinable basis for an impairment that prevents him or her from engaging in any substantial gainful activity for a statutory twelve-month period." *Kangas v. Bowen*, 823 F.2d 775, 777 (3d Cir. 1987); 42 U.S.C. § 423 (d)(1) (1982). Additionally, the claimant must show that she had disability insured status at the time she became disabled or that she attained this status

---

[1] Citations to the record are abbreviated as follows:

"DE _" = Docket entry in this case

"R. _" = Administrative Record (DE 5) (The cited page numbers correspond to the number found in the bottom right corner of the page for all DE 5 attachments)

"PBr." = Plaintiff Davis's Brief (DE 12)

"DBr." = Defendant Social Security Administration's Opposition Brief (DE 17)

"PRep." = Plaintiff's reply brief (DE 18).

2

at some point during her disability. 42 U.S.C. §§ 416(i)(1), 423; 20 C.F.R. § 404.131.

### A. The Five-Step Process and This Court's Standard of Review

Under the authority of the Social Security Act, the Social Security Administration has established a five-step evaluation process for determining whether a claimant is entitled to benefits. 20 C.F.R. §§ 404.1520, 416.920. This Court's review necessarily incorporates a determination of whether the ALJ properly followed the five-step process prescribed by regulation. The steps may be briefly summarized as follows:

**Step One:** Determine whether the claimant has engaged in substantial gainful activity since the onset date of the alleged disability. 20 C.F.R. §§ 404.1520(b), 416.920(b). If not, move to step two.

**Step Two:** Determine if the claimant's alleged impairment, or combination of impairments, is "severe." *Id.* §§ 404.1520(c), 416.920(c). If the claimant has a severe impairment, move to step three.

**Step Three:** Determine whether the impairment meets or equals the criteria of any impairment found in the Listing of Impairments. 20 C.F.R. Pt. 404, subpt. P, app. 1, Pt. A. (Those Part A criteria are purposely set at a high level to identify clear cases of disability without further analysis). If so, the claimant is automatically eligible to receive benefits; if not, move to step four. *Id.* §§ 404.1520(d), 416.920(d).

**Step Four:** Determine whether, despite any severe impairment, the claimant retains the RFC to perform past relevant work. *Id.* §§ 404.1520(e)–(f), 416.920(e)–(f). If not, move to step five.

**Step Five:** At this point, the burden shifts to the Commissioner to demonstrate that the claimant, considering her age, education, work experience, and RFC, is capable of performing jobs that exist in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see Poulos v. Comm'r of Soc. Sec.*, 474 F.3d 88, 91-92 (3d Cir. 2007). If so, benefits will be denied; if not, they will be awarded.

As to all legal issues, this Court conducts a plenary review. *See Schaudeck v. Comm'r of Soc. Sec.*, 181 F.3d 429, 431 (3d Cir. 1999). As to factual findings, this Court adheres to the ALJ's findings, as long as they are supported by substantial evidence. *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004) (citing 42 U.S.C. § 405(g)). Where facts are disputed, this Court will "determine whether the administrative record contains substantial evidence supporting the findings." *Sykes v. Apfel*, 228 F.3d 259, 262 (3d Cir. 2000). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Zirnsak v. Colvin*, 777 F.3d 607, 610 (3d Cir. 2014) (internal quotation marks and citation omitted). Substantial evidence "is more than a mere scintilla but may be somewhat less than a preponderance of the evidence." *Id.* (internal quotation marks and citation omitted).

When there is substantial evidence to support the ALJ's factual findings, this Court must abide by them. *See Jones*, 364 F.3d at 503 (citing 42 U.S.C. § 405(g)); *Zirnsak*, 777 F.3d at 610-11 ("[W]e are mindful that we must not substitute our own judgment for that of the fact finder.").

This Court may, under 42 U.S.C. § 405(g), affirm, modify, or reverse the Commissioner's decision, or it may remand the matter to the Commissioner for a rehearing. *Bordes v. Comm'r of Soc. Sec.*, 235 F. App'x 853, 865-66 (3d Cir. 2007); *Podedworny v. Harris*, 745 F.2d 210, 221 (3d Cir. 1984).

Remand is proper if the record is incomplete, or if there is a lack of substantial evidence to support a definitive finding on one or more steps of the five-step inquiry. *See Podedworny*, 745 F.2d at 221-22. Remand is also proper if the ALJ's decision lacks adequate reasoning or support for its conclusions, or if it contains illogical or contradictory findings. *See Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 119-20 (3d Cir. 2000).

### B. The ALJ's Decision

ALJ David F. Neumann followed the five-step process in determining that Davis was not disabled from September 22, 2008, the alleged onset date, until February 24, 2015, but became disabled as of that date. The ALJ's findings may be summarized as follows:

**Step 1:** At step one, the ALJ determined that Davis had not engaged in substantial gainful activity from the alleged onset date of September 22, 2008. The last date insured for DIB purposes was December 31, 2013. (R. 16).

**Step 2:** At step two, the ALJ determined that Davis had the following severe impairments: post-traumatic stress disorder ("PTSD") and major depressive disorder ("MDD"). (R. 16).

The ALJ addressed certain claimed physical impairments: cervical strain, tinnitus, headaches, fatty infiltration of the liver, and mild osteoarthritis. With appropriate citations to the governing regulations and the medical record, the ALJ found that these impairments were not severe and would not affect Davis's ability to work.

**Step 3:** At step three, the ALJ determined that since the alleged onset date of September 22, 2008, Davis did not have an impairment, or combination of impairments, that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Pt. 404, subpt. P., app. 1. (R. 17). In measuring the severity of an impairment, the ALJ appropriately applied the criteria of Sections 12.04 and 12.06 of Appendix 1. (*Id.*).

**Step 4:** At step four, regarding residual functional capacity ("RFC") there are two findings:

**Prior to February 24, 2015**, the ALJ found, Davis possessed the RFC "to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant could perform simple, routine, repetitive tasks that have a skill level of SVP 2. He could have occasional interaction with supervisors and coworkers." (R. 17).

**Beginning on February 24, 2015**, the ALJ found, Davis possessed the RFC "to perform a full range of work at all exertional levels but with the

5

following nonexertional limitations: except the claimant could perform simple, routine, repetitive tasks that have a skill level of SVP 2. He could have occasional interaction with supervisors and coworkers, and would need to be off task for ten percent of the workday." (R. 21).

The ALJ concluded that Davis has been unable to perform past relevant work under either of these RFC findings—*i.e.*, at any time since the alleged onset date of September 22, 2008. (R. 22).

**Step 5:** At step 5, too, there are two findings:

**Prior to February 24, 2015**, the ALJ found, considering the claimant's age, education, work experience, and RFC, there were jobs that existed in significant number in the national economy that the claimant could have performed. Based on the testimony of the VE, the ALJ found that these included hospital cleaner (DOT 232.687-010), with 500,000 jobs nationally; industrial cleaner (DOT 381.687-018), with 140,000 jobs nationally; and auto detailer (DOPT 915.687-034), with 150,000 jobs nationally. Prior to that date, then a finding of "not disabled" was appropriate. (R. 23–24).

**Beginning on February 24, 2015**, the ALJ found, there were no jobs that exist in significant number in the national economy that the claimant could perform. Based on the additional non-exertional limitations in the claimant's RFC, the VE testified that no such jobs were available. Thus, beginning on February 24, 2015, a finding of "disabled" was appropriate. (R. 24). The disability, the ALJ found, continued through the date of his decision. (*Id.*)

The period of disability as found by the ALJ did not begin until after the date last insured, which was December 31, 2013. The application for DIB benefits, then, was impliedly denied. (R. 24).

For purposes of SSI, however, the period of disability under SSA § 1614(a)(2) began on February 24, 2015. The claimant was referred to the appropriate section of the SSA regarding eligibility and the amount of such

6

payments.[2] Because medical improvement could be expected with appropriate treatment, the ALJ recommended a continuing disability review every 24 months. (R. 25).

### III. Discussion

#### A. Need for medical expert testimony

Davis argues that the ALJ was required, pursuant to Social Security Ruling ("SSR") 83-20 to consult with a medical expert to determine the onset date of disability. *See also* Social Security Administration Hearings, Appeals and Litigation Law Manual (HALLEX) I-2-5-34(A)(2), 1994 WL 637370. The Commissioner replies that the requirements of 83-20 apply only in certain difficult or doubtful cases, and that the medical record here was sufficient to support the ALJ's determination.

In some cases, the onset date is obvious; for example, the claimant may have been severely injured in an accident. SSR 83-20 recognizes, however, that "with slowly progressive impairments, including mental impairments, 'it is sometimes impossible to obtain medical evidence establishing the precise date an impairment became disabling.'" *Moncur v. Comm'r of Soc. Sec.*, Civil Action No. 17-4811 (ES), 2018 U.S. Dist. LEXIS 187934, at *10 (D.N.J. Nov. 2, 2018) (quoting *Spellman v. Shalala*, 1 F.3d 357, 361 (5th Cir. 1993)). SSR 83-20 allows the ALJ to infer the onset date by consulting with a medical advisor when an impairment is "slowly progressive," the alleged onset date and date of last employment are well in the past, and the medical records are insufficient for the time period in question. *See Walton v. Halter*, 243 F.3d 703, 709 (3d Cir. 2001) (citing SSR 83-20); *see also Guerrero v. Comm'r of Soc. Sec.*, No. 05-cv-1709 (FSH), 2006 WL 1722356, at *5 (D.N.J. Jun. 19, 2006) (noting that SSR 83-20 permits ALJ to call medical expert to infer actual onset date "where the impairment is slowly progressing, the alleged onset date is far in the past, and

---

[2] For a person like Mr. Davis who has not attained the age of 65 and is not blind, SSI eligibility depends on a finding of disability, plus screening for maximum income and certain assets on hand. The record does not indicate whether Mr. Davis otherwise qualifies for SSI.

7

adequate medical records for the most relevant period are not available." (citations omitted)), *aff'd*, 249 F. App'x 289 (3d Cir. 2007).

"The starting point in determining the date of onset of disability is the individual's statement as to when disability began." 1983 SSR LEXIS 25, *4. The date alleged by the claimant should be used by the ALJ if it is consistent with the evidence available. 1983 SSR LEXIS 25, *6. However, where the alleged onset date is not consistent with the claimant's work history or the medical and other evidence of record, the ALJ is required to infer an onset date. *Id.*

The Third Circuit has reversed an ALJ's determination of an onset date where there was "no legitimate basis for the conclusion of the ALJ on the onset issue" and where the ALJ opted to rely "on his lay analysis of the evidence" rather than "call upon the services of a medical advisor" pursuant to SSR 83-20. *Walton*, 243 F.3d at 709; *see also Newell*, 347 F.3d at 549.

Subsequent case law has interpreted the directive of *Walton* and *Newell* to apply, not in every case, but only where (1) the impairment at issue becomes progressively worse over an extended period of time and (2) the ALJ must infer the onset date based on unclear or nonexistent medical records. *See Perez*, 521 F. App'x at 56-57 (SSR 83-20 generally applies "where medical evidence from the relevant period is unavailable."); *Yots v. Comm'r of Soc. Sec.*, 704 F. App'x 95, 97 (3d Cir. 2017) (SSR 83-20 applies "where the record contain[s] no evidence to substantiate or contradict a claimant's subjective testimony as to pain and impairment."); *Bailey v. Comm'r of Soc. Sec.*, 354 F. App'x 613, 618 (3d Cir. 2009) ("As the District Court noted, further decisions of our court have confirmed that *Walton*'s directive to seek out the services of a medical advisor is limited to situations where the underlying disease is progressive and difficult to diagnose, where the alleged onset date is far in the past, and where medical records are sparse or conflicting."); *see also Klangwald v. Comm'r of Soc. Sec.*, 269 F. App'x 202, 205 (3d Cir. 2008) ("we have generally applied SSR 83–20 only where medical evidence from the relevant period is unavailable"); *Kirk v.*

8

*Comm'r of Soc. Sec.*, 177 Fed. App'x 205, 208-09 (3d Cir. 2006) (finding *Walton* inapplicable where plaintiff's claim of earlier onset created a time period of only three years and where medical evidence for relevant period supported ALJ's conclusion regarding onset date). Where the record is adequate, then, a medical expert is not required. The Third Circuit has held that an ALJ can reasonably determine an onset date where the ALJ has access to adequate medical records relating to the relevant time period. *Jakubowski v. Comm'r of Soc. Sec.*, 215 F. App'x 104, 108 (3d Cir. 2007) ("By contrast with *Newell* and *Walton* . . . the ALJ in this [DIB] case had access to adequate medical records from the time period before the expiration of Jakubowski's insured status, and these records did not support her alleged onset date.").

For the reasons stated in subsection B, immediately following, the medical records and other evidence here are not so unclear, sparse, or unsatisfactory as to prevent the ALJ from making a reliable decision as to the onset date. Most pertinently, Mr. Davis's condition has been monitored regularly by the Department of Veterans Affairs. I therefore will not remand based on the failure to comply with the SSR 83-20 directive to obtain independent medical evidence.

### B. Substantial Evidence Supporting Onset Date Determination

The ALJ's determination that the onset date was February 24, 2015 was supported by substantial evidence, which the ALJ reviewed and weighed appropriately. Like the ALJ and the plaintiff himself, I focus here on the mental impairments. I first survey the VA treatment notes and rating decisions, and then discuss separately the medical opinion evidence.

#### a. Treatment Notes and VA Rating Decisions

Mr. Davis served his country in the armed forces and was discharged in 2008.

On April 22, 2009, the VA rendered a rating decision. It explained that Mr. Davis was diagnosed with mild-to-moderate PTSD in late 2008 (R. 352). His condition was characterized by recurring and intrusive thoughts, memories, and dreams. (R. 352). He reported avoiding situations that would provoke such

thoughts, decreased interest in activities, detachment from others, sleep difficulty, irritability and hypervigilance (R. 352). Mr. Davis was assigned a Global Assessment of Functioning (GAF) score of 64, indicating only mild symptoms (R. 352). Plaintiff was also diagnosed with several other conditions and given a 70% combined service-related disability evaluation (R. 358). His PTSD-related impairment value was 30% (R. 352).

In November 2009, Plaintiff was found positive for PTSD based on screening questions. He reported nightmares and intrusive thoughts, but denied symptoms of depression. (R. 544).

In April 2011, Mr. Davis was evaluated for anxiety and reported having experienced symptoms of sadness and depression. He stated that currently, however, he was feeling confident, his sleep was good, and his concentration adequate. Plaintiff's sleep was good, and his concentration was adequate (R. 410). He denied experiencing any functional impairments or relational conflicts, or suicidal ideation. A mental status examination indicated that Plaintiff was non-depressed (euthymic), with judgment intact. (R. 409–10). and although his speech was pressured, his thoughts were mostly relevant, though abstract at times (R. 410). Plaintiff described his one or two mental health treatment sessions as "mostly for venting" (R. 410). At this time, he was attending full-time classes as Essex County Community College (R. 410). He denied severe emotional distress, anxiety, panic symptoms, hopelessness, insomnia, obsessions, hallucinations, or physical pain (R. 411-12). He was diagnosed with adjustment disorder, with depression (in remission), and marijuana abuse (R. 411). He was assigned a GAF score of 70, indicating only mild symptoms (R. 411).

In February 2012, Plaintiff was screened by the VA for depression and scored a "0" on the exam, which is negative for depression (R. 432).

In August 2012, Plaintiff was evaluated for insomnia, apparently triggered by witnessing an incident of gun violence. (R. 392). He reported no symptoms such as panic attacks or nightmares; feelings of "paranoia" about Iraq, he said, continued but had abated in intensity. He stated that he had no

anxiety about leaving home, but preferred the company of a small circle of family and friends. He continued to work out, read, and go to class. (R. 393). A mental status examination indicated that Plaintiff's appearance, psychomotor activity, eye contact, speech, thought process and content, cognition, insight, and judgment were all within normal limits (R. 396). He again was assigned a GAF score of 70, indicating only mild symptoms (R. 396). His physician prescribed a short-term sleep aid. (R. 397).

In May 2014, a psychosocial assessment performed by the VA indicated that Plaintiff was not suicidal, and he spent his time exercising, reading, and spending time with family (R. 641, 643). At that time, Plaintiffs affect and mood were appropriate, his thought process was intact, and he had no delusions or hallucinations. His memory and concentration were within normal limits, and he reported that among his strengths were patience and self-control (R. 644). Plaintiff denied experiencing severe emotional distress, anxiety, panic symptoms, hopelessness, obsessionality, or hallucinations, but he did complain of insomnia. The social worker conducting the evaluation reported that there were baseline risk factors, but no indication of acute risk factors (R. 646).

In November 2014, VA records reflect that another evaluation by a social worker yielded similar conclusions to the May 2014 evaluation. (R. 881-82).

In December 2014, VA records would fairly be read to indicate some deterioration. Mr. Davis was not suicidal, and he did not experience severe anxiety, panic symptoms, hopelessness, obsessionality, or hallucinations (R. 839-40). He did complain, however, of severe emotional distress and insomnia His condition, he said, had worsened recently, and he was experiencing more anger, depression, crying spells, decreased concentration, self-isolation, hypervigilance, and poor sleep He reported hearing voices when under stress but did not indicate he had paranoid delusions or other hallucinations (R. 841-42). The mental status examination, while noting the above symptoms, also indicated normal thought processes, with fair judgment and insight (R. 843).

11

On February 2, 2015, VA treatment notes indicate that Mr. Davis was not suicidal, did not complain of irritability or aggression, anxiety, depression, or apathy (R. 961-63). His appearance, speech, and memory were normal and appropriate. His judgment was intact and he showed no thought disorders or hallucinations (R. 963-64). He complained of difficulty falling asleep (R. 964).

That temporary improvement reversed itself. On February 24, 2015, Plaintiff reported to the VA that his anger and irritability had increased since his last evaluation (R. 807). He denied feelings of aggression, but also reported thoughts of violence that he did not act on (R. 807). He reported increased depressed mood, continued hypervigilance, intrusive memories of his military deployment, social isolation, avoidance of reminders of friends who died, and chronic sleep impairment (R. 807). The VA documented that Plaintiff's symptoms had worsened since his last treatment (R. 810-11). Records indicate that Plaintiff experienced a depressed mood, anxiety, chronic sleep impairment, disturbances of motivation and mood, and difficulty establishing and maintaining effective work and social relationships (R. 812). The VA nevertheless determined that Plaintiff's condition did not preclude employment (R. 812).

On January 6, 2016, the VA issued a new rating decision (R. 248). As of February 24, 2015, the VA determined that Plaintiff was not entitled to individual unemployment benefits because he was currently sending out applications, looking for work, and his examiner at the VA had opined that his symptoms would not preclude employment (R. 249). However, his overall combined rating was increased from 70% to 90% based on a review of his updated medical records, effective February 24, 2015 (R. 249). His PTSD-related impairment value increased from 30% to 70% (R. 248).

### b. Medical Opinions

On September 29, 2014, consultative psychological examiner Paul Fulford, Ph.D., examined Plaintiff and issued a report (R. 801). Plaintiff drove himself to the examination and listed his chief complaints as back pain and anti-social outbursts (R. 801-02). A mental status examination, which

12

indicated that Plaintiff was fully oriented, presented with good grooming and hygiene, normal posture and gait, and a cooperative attitude (R. 802). Plaintiff's was able to provide personal information, displayed good mental control, spoke normally, and was able to say the alphabet out loud and count backwards from 20. His concentration was good; he could spell the word "world" forwards and backwards, calculate simple math equations, and had no indications of short term memory deficits. His abstract thinking was found intact. He reported hearing voices, but denied any other hallucinations. He complained of depression, but denied suicidal thoughts. He complained of paranoid thoughts, such as people talking about him behind his back (R. 802). His intelligence appeared normal, and his judgment, motivation and level of effort appeared good. Dr. Fulford diagnosed Plaintiff with dysthymic disorder (R. 803).

In October 2014, as part of the initial disability determination, state agency reviewing psychiatrist Seymour Bortner, M.D., independently reviewed the medical records. Dr. Bortner found no restrictions of activities of daily living, mild difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace, and no repeated episodes of extended decompensation (R. 78). While VA had diagnosed Mr. Davis with mild/moderate PTSD, Dr. Bortner found that his activities of daily living appeared independent and appropriate (shopping/cooking, doing chores, handling finances). Mr. Davis could understand/execute both simple and complex instructions, make work-related decisions, interact with others, and adapt to work place changes. Dr. Bortner concluded that Plaintiff's PTSD was non-severe (R. 79).

In May 2015, as part of the disability reconsideration determination, state agency reviewing psychiatrist Jocelyn Fierstien, M.D., reviewed Plaintiff's medical records. She determined that at that time he had no restrictions of activities of daily living, mild difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace, and no repeated episodes of extended decompensation Dr. Fierstien concurred that Plaintiff's PTSD was non-severe (R. 99).

13

On July 6, 2016, a consultative mental examiner, Eleanor Siegel, Ph.D., met with Mr. Davis, and fund that his PTSD had progressed to the point of being severe. He had driven himself himself to the exam (R. 975). He reported that he typically stays at home, where he watches television, cooks, does his laundry. He is able to shower and dress; he shops and plays chess on his computer, but generally avoids people (R. 976). Following a mental status examination, Dr. Siegel she diagnosed Plaintiff with severe, chronic PTSD and severe, chronic major depressive disorder (R. 977). She wrote that, as of that time, he was unable to perform the material duties of his regular occupation on a competitive basis (R. 977). Dr. Siegel opined that Mr. Davis is unable to relate to people; he is guarded, vigilant, and anxious; he loses his focus and cannot concentrate on a task. She further noted distortions of reality related to misperceiving people's motives and hearing voices (R. 978).

The Third Circuit has stated that "*Burnett [v. Commissioner of Social Security*, 220 F.3d 112 (3d Cir. 2000)] does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis. Rather, the function of *Burnett* is to ensure that there is sufficient development of the record and explanation of findings to permit meaningful review." *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004); *see also Pintal v. Comm'r of Soc. Sec.*, 602 F. App'x 84, 88 (3d Cir. 2015) ("an ALJ is not required to cite every piece of evidence in the record.").

The ALJ's decision shows every indication that he reviewed all of the pertinent evidence of record and gave it meaningful consideration. Upon consideration of all of the above facts and medical opinions, the ALJ determined that, prior to February 24, 2015, Plaintiff had the RFC to perform a range of work at all exertional levels. Nonexertional limitations, however, dictated that Mr. Davis could only perform work tasks that were simple, routine, and repetitive, and that have a skill level of SVP 2. Additionally, he could have only occasional interaction with supervisors and coworkers (R. 17). Aided by the expert opinion of the VE, the ALJ properly found that this level of

14

impairment did not preclude Mr. Davis from engaging in jobs available in significant numbers in the national economy.

Beginning on September 24, 2015, the ALJ added an additional RFC restriction due to an increase in Plaintiff's symptoms (R. 21). The ALJ determined that Plaintiff would also need to be off task for ten percent of the workday (R. 21). Based on that additional restriction, the VE rendered an opinion that Mr. Davis could not, going forward from that date, perform jobs available in the national economy.

The ALJ's findings were well supported by substantial evidence of record. Indeed, virtually all of the evidence points in the same direction. Mr. Davis suffered from a non-disabling mental impairment that got worse. When a position is progressive, the onset date will always present a judgment call. The ALJ's well-supported conclusion was that by February 24, 2015, Mr. Davis's non-exertional impairments had worsened to the point that he would be off-task for 10% of the workday. Based on that determination, as well as the expert testimony of the VE, the ALJ reasonably decided that Mr. Davis, although he could have maintained employment prior to the February 24, 2015 onset date, could no longer reasonably maintain employment.

## IV. Conclusion

For the foregoing reasons, the ALJ's decision is affirmed. An appropriate order accompanies this Opinion.

Dated: September 26, 2019

**KEVIN MCNULTY**
**United States District Judge**

15